**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

**Sarah N. Westcot, *Pro Hac Vice Application Forthcoming***
swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305)-330-5512
Facsimile: (305) 676-9006

**Max S. Roberts, *Pro Hac Vice Application Forthcoming***
mroberts@bursor.com
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LIZETH JIMENEZ, AYREANNE BORDEAUX, KRYSTINE AQUINO-RORALDO, and REGINA BERRIOS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MARS, INC., MARS PETCARE US, INC., MMI HOLDINGS, INC., MEDICAL MANAGEMENT INTERNATIONAL, INC. d/b/a BANFIELD PET HOSPITAL, and VCA INC.,

Defendants.

Case No. 3:23-cv-01786-YY

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**
**(1) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 631**
**(2) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 632**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

**PAGE(S)**

NATURE OF THE ACTION .......... 1

PARTIES .......... 1

JURISDICTION AND VENUE .......... 4

STATEMENT OF FACTS .......... 5

I. California Protects Their Residents' Privacy In Online Communications Concerning Veterinary Care .......... 5

A. The California Invasion Of Privacy Act .......... 5

B. California Business & Professional Code § 4857(a) .......... 7

II. Facebook, As Enabled By Defendants, Wiretaps Californians' Communications Concerning Their Pets' Veterinary Care, In Violation Of The CIPA .......... 7

A. Overview Of Facebook's Advertising Platform And The Meta Pixel .......... 8

B. Defendants Enable Facebook, Through The Meta Pixel, To Intercept Californians' Communications Concerning Their Pets .......... 14

1. Facebook, As Enabled By Defendants, Intercepts Communications Concerning Scheduling Appointments, Including Pet And Owner Names .......... 15

2. Facebook, As Enabled By Defendants, Intercepts Communications Concerning The Medications Owners Purchase For Their Pets .......... 20

3. Facebook, As Enabled By Defendants, Intercepts Communications Concerning Pet Profile Views .......... 22

C. Defendants Enable Facebook To Pair Event Data With A User's Identity .......... 24

D. Defendants Never Received Users' Consent To Disclose Their Confidential Communications To Facebook .......... 26

III. The Subsidiaries' Contacts And Conduct Can Be Imputed Onto Mars .......... 31

CLASS ACTION ALLEGATIONS .......... 36

CAUSES OF ACTION .......... 38

Count I .......... 38

Count II .......... 40

PRAYER FOR RELIEF .......... 42

JURY TRIAL DEMANDED .......... 42

Plaintiffs Lizeth Jimenez, AyreAnne Bordeaux, Krystine Aquino-Roraldo, and Regina Berrios ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this suit on behalf of all Facebook users who have an account with Banfield Pet Hospital or VCA Animal Hospitals.

2. Defendant Mars, Inc. ("Mars") is the parent company of Defendant Mars Petcare US, Inc. ("Mars Petcare"), Defendant MMI Holdings, Inc. ("MMI Holdings"), Defendant Medical Management International, Inc. d/b/a Banfield ("Banfield"), and Defendant VCA, Inc. ("VCA").[1]

3. Banfield and VCA are two of the "largest veterinary practices in the world."[2]

4. Defendants aid, employ, agree with, or otherwise enable a third party, Meta Platforms, Inc. ("Facebook"), to eavesdrop on communications sent and received by Plaintiffs and Class Members, including communications that contain sensitive and confidential information about their pets. By failing to procure consent before enabling Facebook to intercept these communications, Defendants violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

5. Plaintiff Lizeth Jimenez is a resident and citizen of Huntington Park, California. In or around 2010, Plaintiff Jimenez created a Facebook account. Between 2019 and November 2022, Plaintiff Jimenez visited a website operated by Defendants, www.vcahospitals.com (the

---

[1] These entities shall be collectively referred to as the "Subsidiaries." Defendant Mars and the Subsidiaries shall be collectively referred to as "Defendants."

[2] BANFIELD PET HOSPITALS, LINKEDIN, https://www.linkedin.com/company/banfield-pet-hospital/; *see also* MARS, OUR VETERINARY BUSINESSES, https://www.marsveterinary.com/who-we-are/our-companies/.

"VCA Website"), on the same browser as she accessed Facebook. Plaintiff Jimenez was in California when she visited the VCA Website. Upon accessing the VCA Website, and as alleged in greater detail below, Plaintiff Jimenez scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendants—including communications that contained confidential information about her pet's veterinarian records. Neither Defendants nor Facebook procured Plaintiff Jimenez's prior consent to this interception.

6. Plaintiff AyreAnne Bordeaux is a resident and citizen of Sugarloaf, California. In or around 2009, Plaintiff Bordeaux created a Facebook account. Between 2020 and November 2023, Plaintiff Bordeaux visited a website operated by Defendants, the VCA Website, on the same browser as she accessed Facebook. Plaintiff Bordeaux was in California when she visited the VCA Website. Upon accessing the VCA Website, and as alleged in greater detail below, Plaintiff Bordeaux scheduled veterinary appointments and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendants—including communications that contained confidential information about her pet's veterinarian records. Neither Defendants nor Facebook procured Plaintiff Bordeaux's prior consent to this interception.

7. Plaintiff Krystine Aquino-Roraldo is a resident and citizen Daly City, California. In or around 2010, Plaintiff Aquino-Roraldo created a Facebook account. Between August 2023 and November 2022, Plaintiff Aquino-Roraldo visited a website operated by Defendants, www.banfield.com (the "Banfield Website"), on the same browser as she accessed Facebook. Plaintiff Aquino-Roraldo was in California when she visited the Banfield Website. Upon accessing the Banfield Website, and as alleged in greater detail below, Plaintiff Aquino-Roraldo scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendants—including communications that contained confidential information

about her pet's veterinarian records. Neither Defendants nor Facebook procured Plaintiff Bordeaux's prior consent to this interception.

8. Plaintiff Regina Berrios is domiciled in Roseville, California. In or around July 2007, Plaintiff Berrios created a Facebook account. Between July 2023 and November 2023, Plaintiff Berrios visited a website operated by Defendants, the Banfield Website, on the same browser as she accessed Facebook. Plaintiff Berrios was in California when she visited the Banfield Website. Upon accessing the Banfield Website, and as alleged in greater detail below, Plaintiff Berrios scheduled veterinary appointments and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendants—including communications that contained confidential information about her pet's veterinarian records. Neither Defendants nor Facebook procured Plaintiff Bordeaux's prior consent to this interception.

9. Defendant Mars, Inc. ("Mars") is a Delaware corporation with its principal place of business at 6885 Elm Street, McLean, Virginia, 22101. Mars is estimated to be one of the largest private companies in the United States.[3] Mars operates in "six business segments[:] Petcare, Chocolate, Wrigley, Food, Drinks, [and] Symbioscience."[4]

10. Defendant Mars Petcare US, Inc. ("Mars Petcare") is a Delaware corporation with its principal place of business at 2013 Ovation Parkway, Franklin, Tennessee, 37067. Mars Petcare is a "wholly-owned subsidiary of Mars, Inc."[5] that constitutes the "Petcare" segment of Mars.[6] Mars Petcare includes the "global division," Mars Veterinary Health ("MVH"), and MVH's "two units: Mars Veterinary Health North America … and Mars Veterinary Health International and Diagnostics."[7]

---

[3] https://fortune.com/2013/01/17/mars-incorporated-a-pretty-sweet-place-to-work/.

[4] *Id.*

[5] https://www.ftc.gov/business-guidance/blog/2016/08/mars-petcare-doghouse-deceptive-claims-about-eukanuba.

[6] https://www.mars.com/our-brands/petcare.

[7] https://news.vin.com/default.aspx?pid=210&Id=9297861&f5=1.

11. Defendant MMI Holdings, Inc. is a Delaware corporation with its principal place of business at 18101 SE 6th Way, Vancouver, Washington, 98683. Defendant MMI Holdings is "a wholly owned subsidiary of Mars that operates certain portions of its Petcare segment."[8] Both Defendant Banfield[9] and Defendant VCA[10] are wholly owned subsidiaries of Defendant MMI Holdings.

12. Defendant Medical Management International, Inc. d/b/a Banfield Pet Hospital is a Delaware corporation with its principal place of business at 18101 SE 6th Way, Vancouver, Washington, 98683. Defendant Banfield is registered to do business in Oregon, conducts extensive business throughout Oregon, and has twenty-nine (29) locations in Oregon.[11] On its website, Mars states that Banfield is a "Mars Veterinary Health North America practice[]."[12]

13. Defendant VCA Inc. is a Delaware corporation with its principal place of business at 12401 West Olympic Boulevard, Los Angeles, California, 90064. Defendant VCA is registered to do business in Oregon, conducts extensive business throughout Oregon, and has twenty (20) locations in Oregon.[13] On its website, Mars states that VCA is a "Mars Veterinary Health North America practice[]."[14]

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members

---

8 https://www.sec.gov/Archives/edgar/data/817366/000119312517044647/d335545ddefm14a.htm.

9 https://www.sec.gov/Archives/edgar/data/863157/000095012311054785/R6.htm.

10 https://www.sec.gov/Archives/edgar/data/817366/000162828017001885/woof-2016x12x31x10k.htm.

11 https://www.banfield.com/locations/hospitals-by-state.

12 https://www.marsveterinary.com/advancing-equity-inclusion-diversity-in-the-veterinary-profession/.

13 https://vcahospitals.com/find-a-hospital/location-directory.

14 https://www.marsveterinary.com/advancing-equity-inclusion-diversity-in-the-veterinary-profession/.

of the putative Class, and at least one member of the proposed Class is a citizen of a state different from at least one Defendant.

15. This Court has personal jurisdiction over Defendants because, as alleged in more detail below, Defendants purposefully availed themselves of this forum by conducting substantial business within Oregon such that Defendants have significant, continuous, and pervasive contacts with the State of Oregon. Further, Defendants Banfield and VCA have numerous Oregon locations and their forum contacts may be imputed to the other Defendants (with whom they share a unity of interest and for whom they are alter egos).

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## STATEMENT OF FACTS

### I. CALIFORNIA PROTECTS THEIR RESIDENTS' PRIVACY IN ONLINE COMMUNICATIONS CONCERNING VETERINARY CARE

#### A. The California Invasion Of Privacy Act

17. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

18. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

19. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been

> recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

20. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

(i) "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire";

(ii) "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii) "us[ing], or attempt[ing] to use … any information so obtained."

21. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

22. The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

23. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

24. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.3.

**B. California Business & Professional Code § 4857(a)**

25. As the American Veterinary Medical Association ("AMVA") recognizes, "[t]he information within veterinary medical records is confidential."[15]

26. Indeed, one of AMVA's principles is that veterinarians "must protect the personal privacy of clients, and veterinarians must not reveal confidences unless required to by law or unless it becomes necessary to protect the health and welfare of other individuals or animals."[16]

27. In 1999, in line with these principles, the California Legislature enacted Cal. Bus. & Prof. Code § 4857(a), which prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal."

28. According to the law's sponsors:

> Many veterinarians currently conduct business as if their records were "confidential." *Veterinary clients believe the records to be confidential*, as their own personal records are kept confidential with their medical doctors. [The California Veterinary Medical Association] feels that public policy should be established to make it clear that the privilege of releasing veterinary information *rests with the client*.

California Bill Analysis, S.B. 490 Sen. (May 11, 1999) (emphasis added).

29. Further, as the legislative history indicates, misuse of veterinary medical information can be problematic. "For instance, information from a medical record in the wrong hands could cause harm to a breeder's reputation, obstruct a contractual sale, or even alter the value and salability of an animal." *Id.* (cleaned up).

## II. FACEBOOK, AS ENABLED BY DEFENDANTS, WIRETAPS CALIFORNIANS' COMMUNICATIONS CONCERNING THEIR PETS' VETERINARY CARE, IN VIOLATION OF THE CIPA

---

[15] AMERICAN VETERINARY MEDICAL ASSOCIATION, PRINCIPLES OF VETERINARY MEDICAL ETHICS OF THE AVMA (Oct. 20, 2023), https://www.avma.org/resources-tools/avma-policies/principles-veterinary-medical-ethics-avma.

[16] *Id*.

### A. Overview Of Facebook's Advertising Platform And The Meta Pixel

30. Facebook describes itself as a "real identity platform,"[17] meaning users are allowed only one account and must share "the name they go by in everyday life."[18] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[19]

31. In 2021, Facebook generated $117 billion in revenue.[20] Roughly 97% of that came from selling advertising space.[21]

32. Facebook sells advertising space by highlighting its ability to target users.[22] Facebook can target users so effectively because it surveils user activity both on and off its site.[23] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[24] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[25]

---

[17] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[18] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[19] FACEBOOK, SIGN UP, https://www.facebook.com/.

[20] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx.

[21] *Id.*

[22] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[23] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[24] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[25] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

33. Advertisers can also build "Custom Audiences."[26] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[27] With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[28]

34. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[29]

35. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[30]

36. Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

37. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and

---

[26] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[27] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[28] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[29] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[30] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

metadata, or when a user downloads a mobile application or makes a purchase.[31] However, Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[32] Advertisers can even create their own tracking parameters by building a "custom event."[33]

38. One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Defendants, to integrate into their websites. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[34] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software surreptitiously directs the user's browser to simultaneously send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Facebook's embedded code.

39. An example illustrates the point. Take an individual who navigates to the Banfield Website and clicks on a tab to browse medication. Once that tab is clicked, the individual's browser sends a GET request to Defendants' server requesting that server to load the particular webpage. Because Defendants utilize the Facebook Tracking Pixel, Facebook's

---

[31] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[32] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[33] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[34] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly and simultaneously duplicate the communication with Defendants, transmitting it to Facebook's servers alongside additional information that transcribes the communication's content and the individual's identity. This entire process occurs within milliseconds.

40. In other words, when a user communicates with Defendants' website, those communications are simultaneously and contemporaneously duplicated and sent to Facebook at the same time as they are being sent to Defendants. Thus, Facebook's interception of these communications occurs "in transit." *See, e.g., In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

41. After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

42. Facebook's other Business Tools function the same. For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[35]

[35] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

43. Advertisers can also utilize the "Conversions API." The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[36] More technically, the Conversions API is Facebook code that advertisers can implement server-side.[37] Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook."[38]

44. When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[39] As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[40] Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[41]

45. Facebook confirms, in its "Meta Business Tools Terms,"[42] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendants. For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Facebook can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.

[36] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api. This refers to device specific privacy controls.

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one. If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[41] *Id.*

[42] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

46. Facebook can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[43]

47. Further, Facebook can use the event data to help websites like Defendants' "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[44]

48. Finally, Facebook can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[45]

49. Thus, Facebook has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendants, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

///

///

///

///

///

///

///

///

///

[43] *Id.*
[44] *Id.*
[45] *Id.*

**B. Defendants Enable Facebook, Through The Meta Pixel, To Intercept Californians' Communications Concerning Their Pets**

50. Defendants own and operate the Banfield Website and the VCA Website. Defendants have integrated the Facebook Tracking Pixel into both websites.




**Figure 2 – Showing That The Facebook Pixel Is Operating On The Banfield Website**




**Figure 1 – Showing That The Facebook Pixel Is Operating On The VCA Website**

51. On these websites, pet owners can schedule appointments, purchase medications, and check their pet's medical records. When pet owners use these functionalities, they must provide Defendants with confidential information about themselves and their pets.

52. Unbeknownst to pet owners, however, Defendants aid, agree with, employ, or otherwise enable Facebook to eavesdrop on those confidential communications using Facebook's Business Tools.

53. These confidential communications are the product of pet owners affirmatively entering, and interacting with, information on the websites at issue (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from pet owners typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of pet owners: information created by and in response to pet owners' communicative inputs; information created by and in response to pet owners' intended messages to the websites at issue and Defendants; and information created by and in

response to pet owners having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

*1. Facebook, As Enabled By Defendants, Intercepts Communications Concerning Scheduling Appointments, Including Pet And Owner Names*

54. As illustrated below, Facebook, through its Business Tools and as enabled by Defendants, intercepts confidential communications when a consumer schedules a veterinary appointment.

55. For the Banfield Website, users first enter the name of their pet into a form field. Users also select whether the pet is a dog or cat and select the pet's gender (and whether the pet has been neutered or spayed) from a drop-down menu:




**Figure 3**

///

///

///

///

///

///

///

56. Next, users select the reason for their visit from a list of options, including whether this is a "new pet" or if this is a "general health check" for a previously-seen pet:




**Figure 4**

57. Then, users select the date and time for their veterinary appointment, as well as the location. This communication involves a user typing in an address and then clicking on specific dates and times, the same as if a user called the clinic over the phone and asked to schedule an appointment:




**Figure 5**

58. Finally, the patient enters his or her full name, email address, and phone number into form fields. Again, this is the same as if a patient were to call up the clinic to schedule an appointment and provide their contact details over the phone:




**Figure 6**

59. A similar process occurs on the VCA Website. First, users enter the name of their pet into a form field and select whether their pet is a dog or a cat:




**Figure 7**

60. Next, users select the reason for their visit, such as whether the pet is getting vaccines/a general wellness exam, if this is an "emergency," or if this is a "sick visit":




**Figure 8**

61. Then, users select the date and time for their veterinary appointment, as well as the specific veterinarian they would like to see:




**Figure 9**

62. Finally, users enter their full name, email address, and mobile number into form fields to confirm the appointment.




**Figure 10**

63. Facebook, as enabled by Defendants, contemporaneously intercepts the contents of each of these communications (*i.e.*, the information entered by users into the above form fields, or the options selected by users) using the Facebook Tracking Pixel.

*2. Facebook, As Enabled By Defendants, Intercepts Communications Concerning The Medications Owners Purchase For Their Pets*

64. When users purchase pet medications from Banfield, they visit the URL for that medication on Banfield's shop. From there, users select the strength and size of the medication, the packaging, and whether it is a one-time purchase or a reoccurring purchase:




**Figure 11**

65. Facebook, as enabled by Defendants, contemporaneously intercepts the URL of the Banfield webpage visited by users—which contains the name of the pet's medication—using the Facebook Tracking Pixel. Further, Facebook intercepts that the Banfield users clicked the button to purchase medication, which users have to affirmatively select:




**Figure 12**

66. Similarly, when users purchase pet medications from VCA, they visit the URL for that medication on VCA's shop. From there, users select the strength and size of the medication and whether it is a one-time purchase or a reoccurring purchase:




**Figure 13**

67. Facebook, as enabled by Defendants, contemporaneously intercepts the URL of the webpage visited by VCA users—which contains the name of the pet's medication—using the Facebook Tracking Pixel. Further, Facebook intercepts that the VCA users clicked the button to purchase medication, which users have to affirmatively select:




**Figure 14**

68. In short, on both the Banfield Website and the VCA Website, Facebook, as enabled by Defendants, contemporaneously intercepts the names of the medications users purchase for their pets.

### 3. *Facebook, As Enabled By Defendants, Intercepts Communications Concerning Pet Profile Views*

69. To check a pet's medical records, owners must log into their accounts. Pet owners can then review the "pet profile," which displays the pet's name and medical history.




**Figure 15**

///

///

///

///

///

///

///

///




**Figure 16**

70. On both websites, Facebook, as enabled by Defendants, contemporaneously intercepts users' email address and what kind of medical history is being viewed, using the Facebook Tracking Pixel:




**Figure 17**




**Figure 18**

### C. Defendants Enable Facebook To Pair Event Data With A User's Identity

71. As industry leaders,[46] trade groups,[47] and courts agree,[48] an email address is personally identifiable information. Defendants disclose email addresses to Facebook whenever a pet owner schedules an appointment, purchases medications, or checks their pet's medical records.

72. Along with disclosing email addresses, Facebook's Pixels—as enabled by Defendants—pair event data with a user's Facebook ID.

73. When a user accesses Defendants' websites while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID. When accessing the Banfield Website, for example, Facebook received the following six cookies, including the c_user cookie:[49]

| | | |
|---|---|---|
| wd | 1252x764 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| xs | 24%3Aysmw8MIQm... | .facebook.com |

**Figure 19**

[46] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[47] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[48] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[49] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

74. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies[50]:

| | | |
|---|---|---|
| wd | 1252x764 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |

**Figure 20**

75. No matter the circumstances, Facebook receives at least one cookie from a visitor's browser:

| | | |
|---|---|---|
| _fbp | fb.1.1697742797171.... | .banfield.com |

**Figure 21**

76. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[51] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. [52] The datr cookies also identifies a browser. Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[53]

77. The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[54] If that happens, the timer resets and another ninety days begins to accrue.[55]

78. The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[56] If that happens, the time resets, and another ninety days begins to accrue.[57]

[50] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[51] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[52] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[53] *Id.*

[54] *Id.*

[55] Confirmable through developer tools.

[56] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[57] Also confirmable through developer tools.

79. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendants' Banfield and VCA Websites.[58] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[59] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

80. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

81. Defendants use these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

**D. Defendants Never Received Users' Consent To Disclose Their Confidential Communications To Facebook**

82. To summarize the above allegations, Facebook, as enabled by Defendants, collects the contents of Californians' communications with the Banfield and VCA Websites using the Facebook Tracking Pixel. These communications include but are not limited to information about Californians' pets, such as the names of those pets, the details of a veterinary appointment, and what medications are being purchased for those pets. *See* Statement of Facts § II.B.1-3, *supra*. This is information that is affirmatively entered by users in the Banfield and VCA Websites. *Id*. This information is not anonymized because (i) Facebook collects users' email addresses, and (ii) Defendants enable Facebook to link users' communications with their Facebook IDs, which reveal their identities. *See* Statement of Facts § II.C, *supra*.

83. Crucially, neither Defendants nor Facebook procure prior consent from Californians for Facebook to engage in this wiretapping.

---

[58] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[59] *Id*. This is also confirmable by tracking network activity.

84. Mars's Terms of Service informs pet owners that, "[i]f you choose to order pet medications or other prescriptions products via the Sites you are waiving confidentiality of those records, to the extent applicable, *with respect of third parties necessary to fill those prescriptions*."[60] Facebook has no role in filling out prescriptions.

85. Defendants also expressly represent that they will refrain from collecting personally identifiable information. Defendants label the Facebook Tracking Pixel as a "targeting" cookie. Those cookies, Defendants represent, "do not store directly personal information, but are based on uniquely identifying your browser and internet device."




**Figure 22**

[60] MARS, INC., BANFIELD TERMS AND CONDITIONS, https://www.banfield.com/General/Terms; Mars, Inc., VCA Animal Hospitals Terms and Conditions, https://vcahospitals.com/terms-and-conditions.




**Figure 23**

86. As courts across the country have recognized, however, the identifiers that the Facebook Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information." By capturing this information anyway, Defendants fail to receive consent from visitors to intercept their communications.

87. Likewise, Facebook never receives consent from Defendants' website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

88. When first signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[61] the Cookies Policy,[62] and the Data Policy.[63] For California residents, Facebook also publishes a California Privacy Policy.[64]

---

[61] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[62] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[63] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[64] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

89. Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[65] The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[66]

90. Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[67] The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[68] Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[69]

91. Facebook then offers an express representation: "*We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us*."[70] Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[71]

92. Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[72]

93. For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and share your data before providing any data to

---

[65]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[66] *Id.*

[67] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

us."[73] The California Privacy Policy also restrict Facebook's ability to collect "data with special protections," stating they do so only when users "choose to provide it."[74]

94. Facebook's other representations reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[75] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[76] Facebook does not "want websites or apps sending us sensitive information about people."[77] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[78]

95. These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[79] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[80]

---

[73] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

[74] *Id.*

[75] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[76] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565 .

[77] *Id.*

[78] *Id.*

[79] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[80] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

96. A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms. At a minimum, those terms and representations require Facebook to build safeguards for sensitive information, like information disclosing a pet's health records. No reasonable user would read those terms and representations as permitting Facebook to intentionally intercept electronic communications that it knows the law protects and deems sensitive. And no user, reasonable or not, could read those terms as allowing Facebook to aid and abet another party's disclosure of such protected and sensitive information. In short, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## III. THE SUBSIDIARIES' CONTACTS AND CONDUCT CAN BE IMPUTED ONTO MARS

97. The Subsidiaries are wholly owned by Mars and all contacts and actions by the Subsidiaries can be imputed onto Mars.

98. As an initial matter, the Subsidiaries are undercapitalized and Mars treats the Subsidiaries' revenue as its own. As Mars's Americas Treasury Director, Adrienne Shumate, averred in a separate matter, "all profits generated by Mars's subsidiaries are transferred daily to Mars's bank account":

> All daily Mars Petcare US revenue minus Mars Petcare US expenses (*i.e.*, Mars Petcare US profit) flow[s] to Mars, Incorporated, with Mars Petcare US having a zero balance in its bank accounts at the end of the day. In other words, all cash earned by Mars Petcare US minus certain expenses flow[s] to Mars, Incorporated, showing a direct link between cash generation by Mars Petcare US that flow[s] to Mars, Incorporated as profits earned. If the profits of Mars Petcare US are diminished, then the profits of Mars, Incorporated are also diminished, and therefore there is less cash available in the system to fund the overall needs of the Mars business.

*Mars, Inc. v. Trurx LLC*, 2016 WL 4034803, at *6 (E.D. Tex. Mar. 14, 2016).

99. Ms. Shumate "stated further that this profit flow occurs by an automatic transfer of funds between bank accounts." *Id.* And even then, "[w]hether the funds transferred … are properly characterized as profits is questionable, given that Ms. Shumate testified in her

deposition that not all of these companies' expenses are deducted before the funds are transferred to Mars." *Id.*, at *6 n. 2. "[A]t least some of the subsidiaries vendor costs are paid directly from a different, separately-managed bank account on behalf of the subsidiaries by another Mars sub-entity." *Id.*

100. In addition, Mars—through its wholly owned, cash-starved subsidiary, Mars Petcare—appoints executives for the other Subsidiaries, those executives report to Mars directly, and there is overlap between Mars's and its Subsidiaries' executives:

(i) On October 8, 2019, VCA announced the appointment of Dr. Todd Lavendar as President. Crucially, the press release stated, "Dr. Lavender will report to Doug Drew, who will now oversee operations for Mars Veterinary Health in North America."[81]

(ii) In a promotion for speakers at the Pet Healthcare Industry Summit 2023, Doug Drew was listed as the "President of Mars Veterinary Health North America," and that his responsibilities include "Banfield … and VCA veterinary hospital groups." The promotion also noted Mr. Drew was the former "President of Animal Hospitals & Petcare Services for VCA."[82]

(iii) In a LinkedIn post regarding his appointment as President of Banfield, Mony Iyer "thank[ed] Doug Drew and others in Mars Petcare."[83]

(iv) Mr. Iyer replaced Brian Garish, who was "appointed president of Mars Veterinary Health International" after serving as Banfield's president.[84]

101. Mars also treats its Subsidiaries' employees as its own and controls its Subsidiaries' employment policies. Indeed, across its websites, Mars repeatedly refers to employees of the Subsidiaries as Mars employees:

---

[81] VCA ANIMAL HOSPITALS NAMES DR. TODD LAVENDER AS PRESIDENT OF ANIMAL HOSPITALS AND PETCARE SERVICES, https://vcahospitals.com/press-center/vca-news/dr-todd-lavender.

[82] SPEAKERS, https://banfieldsummit.com/speaker.

[83] https://www.linkedin.com/posts/mony-iyer-166a27_bheretobecome-proudlymars-activity-6957923673525673984-puKA?trk=public_profile_like_view.

[84] BANFIELD PET HOSPITAL WELCOMES MONY IYER AS NEW PRESIDENT AND JEFF ELLISON AS NEW COO, https://www.banfield.com/about-banfield/newsroom/press-releases/2022/banfield-pet-hospital-welcomes-mony-iyer-as-new-president.

(i) "Today, Mars Petcare employs approximately 50,000 veterinary professionals and cares for more than 10 million pets annually across VCA, Banfield Pet Hospital, BluePear and Pet Partners." The same article refers to Banfield and VCA as a "unit of Mars Petcare."[85]

(ii) "Mars Veterinary Health is a global division within Mars Petcare – more than 70,000 Associates strong. … The Mars Veterinary Health network includes Associates at AniCura, Banfield, BluePearl, Linnaeus, Mount Pleasant, VCA, VES, and VSH."[86]

102. Mars's employee benefits are made available to employees of the Subsidiaries:

(i) On a webpage informing prospective employees of benefits, Banfield notes it offers "access to … our exclusive MVH [(Mars Veterinary Health)] wellbeing platform" and "employee discounts across eligible Mars affiliates."[87]

(ii) Similarly, a post by Banfield on Facebook notes, "all 65,000+ Mars Veterinary Health Associates have access to the most cutting-edge information that enables you to continue providing unrivaled care for pets and thrive in a fulfilling career."[88]

103. Job listings for roles with Mars and the Subsidiaries use Mars's and the Subsidiaries' branding interchangeably:

(i) A job listing for Banfield is for a position entitled "Supply Chain Analyst (Mars Veterinary Health)."[89]

(ii) A job listing for Banfield is for a position entitled "Senior Development Specialist (Mars Veterinary Health)."[90]

---

[85] LINNAEUS, A LEADING UK PROVIDER OF VETERINARY SERVICES, TO JOIN MARS, https://www.mars.com/news-and-stories/press-releases/Linneaus-acquisition.

[86] MARS VETERINARY HEALTH AND VETERINARY LEADERS TEAM UP TO STRENGTHEN HOSPITAL-CLIENT RELATIONSHIPS, https://www.banfield.com/en/about-banfield/newsroom/press-releases/2022/mars-veterinary-health-and-veterinary-leaders-team-up-to-strengthen-hospital-client-relationships.

[87] EARLY OFFERINGS FOR NEW GRADUATES, https://jobs.banfield.com/Banfield-New-Opportunities.

[88] https://www.facebook.com/BanfieldLife/videos/did-you-know-that-all-65000-mars-veterinary-health-associates-have-access-to-the/1084379162198276/.

[89] https://jobgether.com/offer/657b90654929449570da165b-supply-chain-analyst-mars-veterinary-health.

[90] https://jobs.banfield.com/job/remote/senior-deployment-specialist-mars-veterinary-health/138/60325898192.

(iii) A job listing for Banfield is for a position entitled "Digital Change Manager (Mars Veterinary Health)."[91]

104. Mars makes decisions regarding its Subsidiaries' pay scale, benefits, and diversity requirements. For instance, on July 20, 2021, Mars Veterinary Health North America announced it would spend "$500 million to improve employee pay, benefits, diversity and career opportunities across its brands, including Banfield [and] VCA … [T]he commitment through 2025 includes: Increased wages and benefits, and paid parental leave, disability and 401(k) matching."[92]

105. Mars holds out the Subsidiaries as part of Mars, rather than entirely separate entities.

(i) In articles in August 2021,[93] April 2023,[94] and December 2023,[95] Mars refers to Banfield and VCA as "practices" of Mars Veterinary Health North America.

(ii) Banfield and VCA aren't just referred to as among Mars Veterinary Health's "veterinary businesses," they are part of Mars Veterinary Health's "family of practices." Banfield has been part of this "family" since 2007, whole VCA joined in 2017.[96]

---

[91] https://jobs.banfield.com/job/remote/digital-change-manager-mars-veterinary-health/138/58886835872.

[92] *Mars Veterinary Health Invests in Its Employees*, TODAY'S VETERINARY BUSINESS (July 20, 2021), https://todaysveterinarybusiness.com/mars-veterinary-health-employee-benefits/.

[93] *People, Pets, And The Planet: Mars Veterinary Health Announces Plans For 100% Renewable Electricity For All 2,000+ U.S. Hospitals*, MVH THINKS (Aug. 2021), https://www.marsveterinary.com/people-pets-and-the-planet-mars-veterinary-health-announces-plans-for-100-renewable-electricity-for-all-2000-u-s-hospitals/.

[94] *Mars Veterinary Health, AVMA, And Industry Leaders Unveil The Positive Pet Care Guide*, MVH THINKS (Apr. 2023)., https://www.marsveterinary.com/industry-leaders-unveil-positive-pet-care-guide/.

[95] *Advancing Equity, Inclusion & Diversity in the Veterinary Profession*, MVH THINKS (Dec. 2023), https://www.marsveterinary.com/advancing-equity-inclusion-diversity-in-the-veterinary-profession/.

[96] STRONGER TOGETHER: INTRODUCING OUR FAMILY OF VETERINARY PRACTICES AND LABS, https://www.marsveterinary.com/who-we-are/our-companies/.

(iii) Mars touts that Mars Petcare is "a leading veterinary health provider through a network of over 2,000 pet hospitals including Banfield … and VCA."[97]

106. Mars and its Subsidiaries share common office space. Banfield and MMI Holding have their principal place of business in Vancouver, Washington, while VCA has its principal place of business in Los Angeles, California. *See also* Parties, *supra*. Per Mars Veterinary Health's LinkedIn page, Mars Veterinary Health operates out of four locations, including (i) a "primary" location in Vancouver, Washington that has the same address as Banfield's and MMI Holding's principal place of business), and (ii) another location in Los Angeles California that has the same address as VCA's principal place of business.[98]

107. Mars generally exercises dominion and control over the Subsidiaries' websites, and specifically controlled and engaged in the conduct at issue here. Further, both the Banfield Website and VCA Website contain privacy-related policies and notices created by Mars that are linked to Mars's website, and language indicating that Mars owns and/or operates both websites.




**Figure 24**




**Figure 25**

[97] LINNAEUS, A LEADING UK PROVIDER OF VETERINARY SERVICES, TO JOIN MARS, https://www.mars.com/news-and-stories/press-releases/Linneaus-acquisition.

[98] https://www.linkedin.com/company/mars-veterinary-health.

108. Thus, Mars controls the gathering of information—and the information gathered—from the Banfield and VCA websites, meaning Mars controlled the websites and/or websites-related conduct challenged by Plaintiffs and Class Members.

109. In sum, the Subsidiaries are mere instrumentalities of Mars. As summarized in a complaint brought by a former Mars Intellectual Property attorney against Mars:

> Mars, Inc. operates Mars, Petcare US, Inc., its wholly-owned subsidiary, with a unity of interest and ownership such that Mars Petcare US, Inc. is a mere instrumentality of its parent, Mars, Inc. Mars, Inc. maintains a common internal human resources management function (known as Associate Relations or People and Organization (P&O)) applicable to all Defendants, and maintains a unified set of human resource, performance evaluation, and compensation policies. Employees of Mars, Inc. and its subsidiaries—including Mars Petcare US, Inc.—are subject to common salary targets, common organizational structure, and a common competitive salary survey which is used to determine their compensation. With regard to its legal function, Mars, Inc. utilizes a management structure under which employees of the parent corporation directly manage and supervise employees of its subsidiaries. In particular to this action, [plaintiff]'s direct supervisor was an employee of Mars, Inc.

*Kramer v. Mars Petcare US, Inc.*, Case No. 3:20-cv-00291, ECF No. 1 at 5 (E.D. Tenn. Aug. 3, 2020).

## **CLASS ACTION ALLEGATIONS**

110. Plaintiffs Jimenez and Bordeaux seek certification of the following class: all California residents who have a Facebook account and accessed and navigated the VCA Website while in California (the "VCA Class").

111. Plaintiffs Aquino-Roraldo and Berrios seek certification of the following class: all California residents who have a Facebook account and accessed and navigated the Banfield Website while in California (the "Banfield Class").

112. The VCA Class and the Banfield Class shall be collectively referred to as the "Class."

113. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

114. **Numerosity:** The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

115. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following: whether Defendants violated CIPA §§ 631 and 632 and whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

116. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the Plaintiffs, like all other class members, visited the Banfield and VCA websites and had their confidential electronic communications intercepted and disclosed to Facebook.

117. **Adequacy:** Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

118. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendants have acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631

119. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

120. Plaintiffs bring this claim against Defendants individually and on behalf of the Class.

121. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

122. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

123. Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

124. Facebook "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Facebook had the capability to use the wiretapped information for its own purposes. Accordingly, Facebook was a third party to any communication between Plaintiffs Class Members, on the one hand, and Defendants, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

125. At all relevant times, by its Business Tools, Facebook willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on the one hand, and Defendants, on the other, while the electronic

communications were in transit or were being sent from or received at any place within California.

126. At all relevant times, Facebook used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

127. At all relevant times, Defendants aided, agreed with, employed, permitted, or otherwise enabled Facebook to wiretap Plaintiffs and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

128. Plaintiffs and Class Members did not provide their prior consent to Facebook's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling Facebook's conduct.

129. The wiretapping of Plaintiffs and Class Members occurred in California, where Plaintiffs and Class Members accessed the Banfield and VCA Website and where Facebook—as enabled by Defendants—routed Plaintiffs' and Class Members' electronic communications its servers.

130. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

131. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

132. Plaintiffs bring this claim against Defendants individually and on behalf of the Class.

133. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to

> eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

134. Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

135. Cal. Bus. & Prof. Code § 4857(a) prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal." Accordingly, any communications involving "information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal" qualify as "confidential communications" under California law.

136. The following pieces information provided by Plaintiffs and Class Members to the Banfield and VCA Websites constitute "confidential communications": (i) pet names; (ii) type of veterinary appointment (*e.g.*, general wellness checkup, emergency); (iii) the time and date of a veterinary appointment; (iv) Plaintiffs' and Class Members' personally identifying information (*e.g.*, full name, email address, phone number); (v) the medications searched for and purchased by Plaintiffs and Class Members); and (vi) pet profile views.

137. At all relevant times, Facebook intentionally used its Business Tools to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendants, on the other.

138. When communicating with Defendants, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. "Veterinary clients believe the records to be confidential, as their own personal records are kept confidential with their medical doctors," and "the privilege of releasing veterinary information rests with the client." California Bill Analysis, S.B. 490 Sen. (May 11, 1999). Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendants would be on the other end of the communication, and that other, third-party entities like Facebook, would intentionally use an electronic amplifying or

recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

139. Plaintiffs and Class Members did not consent to any of Facebook's actions. Nor have Plaintiffs or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

140. Pursuant to Cal. Penal Code § 637.2, Plaintiffs Brookshier and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a) For an order certifying the putative Class, naming Plaintiffs as the representatives of the putative Class, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: February 16, 2024.

MARKOWITZ HERBOLD PC

*s/ Stanton R. Gallegos*
Stanton R. Gallegos, OSB #160091
StantonGallegos@MarkowitzHerbold.com
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

Sarah N. Westcot, *Pro Hac Vice Application Forthcoming*
swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305)-330-5512
Facsimile: (305) 676-9006

Max S. Roberts, *Pro Hac Vice Application Forthcoming*
mroberts@bursor.com
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150

*Attorneys for Plaintiffs*

2102710.1