**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

LIZETH JIMENEZ, AYREANNE BORDEAUX, and NICKI APAYDIN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

VCA, INC.,

Defendant.

Case No. 4:25-cv-00767-YGR

**SECOND AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

**PAGE**

NATURE OF THE ACTION ........ 1

THE PARTIES ........ 1

JURISDICTION AND VENUE ........ 2

FACTUAL BACKGROUND ........ 3

I. CALIFORNIA PROTECTS ITS RESIDENTS' PRIVACY IN ONLINE COMMUNICATIONS CONCERNING VETERINARY CARE ........ 3

A. The California Invasion Of Privacy Act ........ 3

B. California Business & Professional Code § 4857(a) ........ 4

II. META, AS ENABLED BY DEFENDANT, WIRETAPS CALIFORNIANS' COMMUNICATIONS CONCERNING THEIR PETS' VETERINARY CARE, IN VIOLATION OF THE CIPA ........ 5

A. Overview Of Meta's Advertising Platform And The Meta Pixel ........ 5

III. DEFENDANT ENABLES META, THROUGH THE META PIXEL, TO INTERCEPT CALIFORNIANS' COMMUNICATIONS CONCERNING THEIR PETS ........ 11

A. Meta, As Enabled By Defendant, Intercepts Communications Concerning Scheduling Appointments, Including Pet And Owner Names ........ 12

B. Meta, As Enabled By Defendant, Intercepts Communications Concerning The Medications Owners Purchase For Their Pets ........ 14

C. Meta, As Enabled By Defendant, Intercepts Communications Concerning Pet Profile Views ........ 15

IV. DEFENDANT ENABLES META TO PAIR EVENT DATA WITH A USER'S IDENTITY ........ 15

V. DEFENDANT NEVER RECEIVED USERS' CONSENT TO DISCLOSE THEIR CONFIDENTIAL COMMUNICATIONS TO META ........ 19

CLASS ALLEGATIONS ........ 23

CAUSES OF ACTION ........ 24

COUNT I ........ 24

COUNT II ........ 27

PRAYER FOR RELIEF ........ 28

JURY TRIAL DEMANDED ........ 29

Plaintiffs Lizeth Jimenez, AyreAnne Bordeaux, and Nicki Apaydin ("Plaintiffs") file this Class Action Complaint on behalf of themselves and all others similarly situated (the "Class Members") against VCA, Inc. ("Defendant" or "VCA"). Plaintiffs make the following allegations pursuant to their counsel's investigation and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.[1]

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have a Facebook account and accessed and navigated vcahospitals.com (the "Website") while in California.

2. With its "network of more than 1,000" VCA Animal Hospitals locations, Defendant is "one of the world's largest providers of veterinary care[.]"[2]

3. Defendant aids, agrees with, employs, or otherwise enables a third party, Meta Platforms, Inc. ("Meta"), to eavesdrop on communications sent and received by Plaintiffs and Class Members on the Website that Defendant owns and operates, including communications that contain sensitive and confidential information about their pets. By failing to procure consent before enabling Meta to intercept these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## THE PARTIES

4. Plaintiff Lizeth Jimenez is a resident and citizen of Huntington Park, California. In or around 2010, Plaintiff Jimenez created a Facebook account. Between 2019 and November 2022, Plaintiff Jimenez visited the VCA Website on the same browser that she used to access Facebook. Plaintiff Jimenez was in California when she visited the VCA Website. Upon accessing the VCA Website, and as alleged in greater detail below, Plaintiff Jimenez scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records. Each of these communications was intercepted in transit by Meta—as enabled by Defendant—including

[1] Plaintiffs' claims were previously severed and transferred by stipulation of the parties from a proposed class action pending in the District of Oregon. *Jimenez v. Mars, Inc.*, Case No. 3:23-cv-1786, ECF No. 43 (D. Or. Dec. 11, 2024). Per that stipulation, Defendant consented to venue in this District. *Id*.

[2] VCA, ABOUT US, https://vcahospitals.com/about-us.

communications that contained confidential information about Plaintiff Jimenez's pet's veterinarian records. Neither Defendant nor Meta procured Plaintiff Jimenez's prior consent to this interception, nor was Plaintiff Jimenez on notice of the fact that such interceptions were occurring.

5. Plaintiff AyreAnne Bordeaux is a resident and citizen of Sugarloaf, California. In or around 2009, Plaintiff Bordeaux created a Facebook account. Between 2020 and November 2023, Plaintiff Bordeaux visited the VCA Website on the same browser that she used to access Facebook. Plaintiff Bordeaux was in California when she visited the VCA Website. Upon accessing the VCA Website, and as alleged in greater detail below, Plaintiff Bordeaux scheduled veterinary appointments and checked her pet's medical records. Each of these communications was intercepted in transit by Meta—as enabled by Defendant—including communications that contained confidential information about Plaintiff Bordeaux's pet's veterinarian records. Neither Defendant nor Meta procured Plaintiff Bordeaux's prior consent to this interception, nor was Plaintiff Bordeaux on notice of the fact that such interceptions were occurring.

6. Plaintiff Nicki Apaydin is a resident and citizen of Marina del Rey, California. In or around 2005, Plaintiff Apaydin created a Facebook account. Between 2021 and April 2024, Plaintiff Apaydin visited the VCA Website on the same browser that she used to access Facebook. Plaintiff Apaydin was in California when she visited the VCA Website. Upon accessing the VCA Website, and as alleged in greater detail below, Plaintiff Apaydin scheduled veterinary appointments and checked her pet's medical records. Each of these communications was intercepted in transit by Meta—as enabled by Defendant—including communications that contained confidential information about Plaintiff Apaydin's pet's veterinarian records. Neither Defendant nor Meta procured Plaintiff Apaydin's prior consent to this interception, nor was Plaintiff Apaydin on notice of the fact that such interceptions were occurring.

7. Defendant VCA, Inc. is a Delaware corporation with its principal place of business at 12401 West Olympic Boulevard, Los Angeles, California 90064.

## JURISDICTION AND VENUE

8. This Court has subject matter Jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because this is a class action where there are more

than 100 members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

9. This Court has personal jurisdiction over Defendant because its principal place of business is in California.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant consents to suit in this District. *Jimenez v. Mars, Inc.*, Case No. 3:23-cv-1786, ECF No. 43 (D. Or. Dec. 11, 2024).

## FACTUAL BACKGROUND

### I. CALIFORNIA PROTECTS ITS RESIDENTS' PRIVACY IN ONLINE COMMUNICATIONS CONCERNING VETERINARY CARE

#### A. The California Invasion Of Privacy Act

11. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

12. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

13. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—

> the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

14. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use … any information so obtained."

15. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

16. The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

17. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

18. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.3.

**B. California Business & Professional Code § 4857(a)**

19. As the American Veterinary Medical Association ("AMVA") recognizes, "[t]he

information within veterinary medical records is confidential."[3]

20. Indeed, one of AMVA's principles is that veterinarians "must protect the personal privacy of clients, and veterinarians must not reveal confidences unless required to by law or unless it becomes necessary to protect the health and welfare of other individuals or animals."[4]

21. In 1999, in line with these principles, the California Legislature enacted Cal. Bus. & Prof. Code § 4857(a), which prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal."

22. According to the law's sponsors:

> Many veterinarians currently conduct business as if their records were "confidential." *Veterinary clients believe the records to be confidential*, as their own personal records are kept confidential with their medical doctors. [The California Veterinary Medical Association] feels that public policy should be established to make it clear that the privilege of releasing veterinary information *rests with the client*.

California Bill Analysis, S.B. 490 Sen. (May 11, 1999) (emphasis added).

23. Further, as the legislative history indicates, misuse of veterinary medical information can be problematic. "For instance, information from a medical record in the wrong hands could cause harm to a breeder's reputation, obstruct a contractual sale, or even alter the value and salability of an animal." *Id.* (cleaned up).

## II. META, AS ENABLED BY DEFENDANT, WIRETAPS CALIFORNIANS' COMMUNICATIONS CONCERNING THEIR PETS' VETERINARY CARE, IN VIOLATION OF THE CIPA

### A. Overview Of Meta's Advertising Platform And The Meta Pixel

24. Meta describes itself as a "real identity platform,"[5] meaning users are allowed only

[3] AMERICAN VETERINARY MEDICAL ASSOCIATION, PRINCIPLES OF VETERINARY MEDICAL ETHICS OF THE AVMA (Oct. 20, 2023), https://www.avma.org/resources-tools/avma-policies/principles-veterinary-medical-ethics-avma.

[4] *Id.*

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

one account and must share "the name they go by in everyday life."[6] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

25. As recently as 2021, Meta generated over $100 billion in annual revenue.[8] Roughly 97% of that came from selling advertising space.[9]

26. Meta sells advertising space by highlighting its ability to target users.[10] Meta can target users so effectively because it surveils user activity both on and off its site.[11] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and "demographics."[12] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

27. Advertisers can also build "Custom Audiences."[14] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike

---

[6] META, COMMUNITY STANDARDS: ACCOUNT INTEGRITY AND AUTHENTIC IDENTITY, https://transparency.meta.com/policies/community-standards/account-integrity-and-authentic-identity/.

[7] META, SIGN UP, https://www.facebook.com/signup.

[8] META, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx.

[9] *Id.*

[10] META, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[11] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153.

[12] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[13] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227.

[15] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16]

28. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools,"[17] including the Meta Tracking Pixel, as described *supra*.

29. As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18]

30. Put succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

31. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user makes a purchase.[19] However, Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[20] Advertisers can even create their own tracking parameters by building a

---

[16] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531.

[17] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568; META, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341.

[18] META, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[19] *See* META, META PIXEL GUIDE: ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* META, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[20] META, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

"custom event."[21]

32. One such Business Tool is the Meta Tracking Pixel. Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites. As the name implies, the Meta Tracking Pixel "tracks the people and the types of actions they take."[22] When a user accesses a website hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Meta code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Meta's embedded code.

33. An example illustrates the point. Take an individual who navigates to the Website and clicks on a button to browse Defendant's offerings. Once that button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Defendant utilizes the Meta Tracking Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Meta's servers alongside additional information that transcribes the communication's content and the individual's identity. This entire process occurs within milliseconds.

34. In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are being sent to Defendant.

35. After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

[21] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[22] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

36. Meta's other Business Tools function the same. For mobile applications, advertisers can utilize the Facebook SDK, which contains components like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[23]

37. Advertisers can also utilize the "Conversions API." Rather than using pixels that rely on cookies (browser Pixel events), the Conversions API enables tracking directly through advertisers' website servers (server events).[24] Thus, the Conversions API's tracking capabilities are not impacted by a consumer's browser settings, cookies opt-outs, or device-specific privacy controls.[25] In addition, the Conversions API collects "customer information parameters sent with [] server event[s]"[26] so that those server events data points may be "matched to users"[27] – including "people who are more likely to take the action [advertisers] care about."[28]

38. When the Conversions API collects "[s]erver events," those data points are "linked to a dataset ID and are processed like events sent using the Meta Pixel."[29] As with the Meta Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[30] Meta "recommend[s] that advertisers implement the Conversions API alongside

---

[23] META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[24] META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api ("The Conversions API is designed to create a connection between an advertiser's marketing data … from an advertiser's server[] … to Meta systems.").

[25] TUEORIS, DECODING CONVERSIONS API AND PRIVACY IMPLICATIONS, https://tueoris.com/privacy/decoding-conversions-api-and-privacy-implications/.

[26] META, BEST PRACTICES FOR CONVERSIONS API, https://www.facebook.com/business/help/308855623839366.

[27] META, CONVERSIONS API: VERIFYING YOUR SETUP, https://developers.facebook.com/docs/marketing-api/conversions-api/verifying-setup.

[28] META, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.

[29] META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.

[30] META, CONVERSIONS API END-TO-END IMPLEMENTATION, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation#pick-your-integration-type ("send events in real time … via the Conversions API").

their Meta Pixel."[31]

39. Meta confirms, in its "Meta Business Tools Terms,"[32] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant. For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Meta can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.

40. Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[33]

41. Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[34]

42. Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[35]

43. Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

//

//

---

[31] *Id.*

[32] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[33] *Id.*

[34] *Id.*

[35] *Id.*

## III. DEFENDANT ENABLES META, THROUGH THE META PIXEL, TO INTERCEPT CALIFORNIANS' COMMUNICATIONS CONCERNING THEIR PETS

44. Defendant owns and operates the Website. Defendant has integrated the Meta Tracking Pixel into the Website.




**Figure 1 – Showing That The Meta Pixel Is Operating On The VCA Website**

45. On the Website, pet owners can schedule appointments, purchase medications, and check their pet's medical records. When pet owners use these functionalities, they must provide Defendant with confidential information about themselves and their pets.

46. Unbeknownst to pet owners, however, Defendant aids, agrees with, employs, or otherwise enables Meta to eavesdrop on those confidential communications using Meta's Business Tools.

47. These confidential communications are the product of pet owners affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from pet owners typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of pet owners: information created by and in response to pet owners' communicative inputs; information created by and in response to pet owners' intended messages to the websites at issue and Defendant; and information created by and in response to pet owners having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

**A. Meta, As Enabled By Defendant, Intercepts Communications Concerning Scheduling Appointments, Including Pet And Owner Names**

48. As illustrated below, Meta, through its Business Tools and as enabled by Defendant, intercepts confidential communications when a consumer schedules a veterinary appointment.

49. On the Website, users first enter the name of their pet into a form field and select whether their pet is a dog or a cat:




**Figure 2**

50. Next, users select the reason for their visit, such as whether the pet is getting vaccines/a general wellness exam, if this is an "emergency," or if this is a "sick visit":




**Figure 3**

51. Then, users select the date and time for their veterinary appointment, as well as the specific veterinarian they would like to see:




**Figure 4**

52. Finally, users enter their full name, email address, and mobile number into form fields to confirm the appointment.




**Figure 5**

53. Meta, as enabled by Defendant, contemporaneously intercepts the contents of each of these communications (*i.e.*, the information entered by users into the above form fields, or the options selected by users) using the Meta Tracking Pixel.

**B. Meta, As Enabled By Defendant, Intercepts Communications Concerning The Medications Owners Purchase For Their Pets**

54. When users purchase pet medications from VCA, they visit the URL for that medication on VCA's shop. From there, users select the strength and size of the medication and whether it is a one-time purchase or a reoccurring purchase:




**Figure 6**

55. Meta, as enabled by Defendant, contemporaneously intercepts the URL of the webpage visited by VCA users—which contains the name of the pet's medication—using the Meta Tracking Pixel. Further, Meta intercepts that the VCA users clicked the button to purchase medication, which users have to affirmatively select:




**Figure 7**

56. In short, on the Website, Meta, as enabled by Defendant, contemporaneously intercepts the names of the medications users purchase for their pets.

### C. Meta, As Enabled By Defendant, Intercepts Communications Concerning Pet Profile Views

57. To check a pet's medical records, owners must log into their accounts. Pet owners can then review the "pet profile," which displays the pet's name and medical history.




**Figure 8**

58. Meta, as enabled by Defendant, contemporaneously intercepts users' email address and what kind of medical history is being viewed, using the Meta Tracking Pixel:




**Figure 9**

## IV. DEFENDANT ENABLES META TO PAIR EVENT DATA WITH A USER'S IDENTITY

59. Along with the foregoing, Meta's Pixels—as procured by Defendant—pair event data

with a user's Facebook ID.

60. A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or permanently in storage (persistent cookie)."[36] Among other things, persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[37]

61. Meta "place[s] cookies on [a person's] computer or device and receive[s] information stored in [those] cookies when [said person] use[s] or visit[s]: [] Meta Products [(i.e., Facebook, Messenger, Instagram, etc.)]; [and] Products provided by other members of the Meta Companies; and Websites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies [(i.e., the Facebook Business Tools)] into their websites and apps."[38]

62. Thus, in short, through the Meta Tracking Pixel (a nearly invisible, pixel-sized dot on the Website), Meta places cookies on a user's computer that allows Meta to follow a user's surfing behavior across other websites which have implemented a Meta Tracking Pixel or other Meta component.[39]

63. When a user accesses the Website while logged into Meta, the Pixel will compel that user's browser to transmit several cookies, including the c_user, datr, fr, and _fbp[40] cookies:

---

[36] PC MAGAZINE, COOKIE, https://www.pcmag.com/encyclopedia/term/cookie.

[37] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.

[38] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[39] *See, e.g.*, Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr.2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583311 at 2139 ("FB Pixel[ is] a conversion tracking tool embedded via JavaScript on websites, and be used to track users' activities both in space (i.e., in websites utilizing FB Pixel), and in time (i.e., in the past and future). Although FB Pixel advertises a 3-month-long lifespan and can seemingly limit any tracking to at most 3 months, unfortunately, in a great majority of websites with FB Pixel, the pixel employs rolling expiration dates for the f[i]rst-party cookies it places (_fbp), which can postpone its lifespan (and its associated tracking) indef[i]nitely.") (cleaned up).

[40] Note, the Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website. PC MAGAZINE, FIRST-PARTY

| Name | Value | Domain |
|---|---|---|
| _fbp | [redacted] | .vcahospitals.com |
| c_user | [redacted] | .facebook.com |
| datr | [redacted] | .facebook.com |
| dpr | [redacted] | .facebook.com |
| fr | [redacted] | .facebook.com |
| presence | [redacted] | .facebook.com |
| ps_l | 1 | .facebook.com |
| ps_n | 1 | .facebook.com |
| sb | [redacted] | .facebook.com |
| wd | [redacted] | .facebook.com |
| xs | [redacted] | .facebook.com |

**Figure 10**

64. The c_user cookie contains, at least, the user's unencrypted Facebook ID.[41] The c_user cookie has a lifespan of three hundred sixty-five days.[42]

65. The datr cookie contains, at least, a value that uniquely identifies a browser.[43] The datr cookie has a lifespan of four hundred days.[44]

66. The fr cookie contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[45] The fr has a lifespan of ninety days.[46]

COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party-cookie. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here and in the *infra* two images is the _fbp cookie, sent as a first-party cookie.

[41] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user. Description[:] Cookie contains the user ID of the currently signed-in user.").

[42] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[43] *Id.* ("'Datr' is a unique identifier for your browser.").

[44] *Id.*

[45] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[46] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

67. The _fbp cookie contains, at least, a value that uniquely identifies a browser.[47] The _fbp has a lifespan of ninety days.[48]

68. When a Website visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a smaller set of cookies, including the datr, fr, and _fbp cookies:

| Name | Value | Domain |
| --- | --- | --- |
| _fbp | [redacted] | .vcahospitals.com |
| datr | [redacted] | .facebook.com |
| dpr | [redacted] | .facebook.com |
| fr | [redacted] | .facebook.com |
| ps_l | 1 | .facebook.com |
| ps_n | 1 | .facebook.com |
| sb | [redacted] | .facebook.com |
| wd | [redacted] | .facebook.com |

**Figure 11**

69. Meta, at a minimum, uses the c_user, datr, fr, and _fbp cookies to link Facebook IDs and corresponding Facebook profiles and identify users.[49] Meta, itself, explains that these, and/or other "customer information parameters[,]" are ultimately "matched to Meta accounts."[50] In this way, the "cookie[s] identif[y] browsers for the purposes of providing advertising and site analytics services."[51]

70. These cookies are used to pair event data with personally identifiable information so

---

[47] *Id.* ("Cookie[:] _fbp. Description[:] These cookies identify browsers for businesses using our Meta Products for the purposes of providing advertising and site analytics services."). *See also* FACEBOOK, CUSTOMER INFORMATION PARAMETERS, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters#fbp ("The Facebook browser ID value is stored in the _fbp browser cookie.").

[48] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[49] *Id.*

[50] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.

[51] FACEBOOK, COOKIES POLICY, https://www.facebook.com/policy/cookies.

Meta can later retarget consumers on Facebook.

## V. DEFENDANT NEVER RECEIVED USERS' CONSENT TO DISCLOSE THEIR CONFIDENTIAL COMMUNICATIONS TO META

71. To summarize the above allegations, Meta, as enabled by Defendant, collects the contents of Californians' communications with the Website using the Meta Tracking Pixel. These communications include but are not limited to information about Californians' pets, such as the names of those pets, the details of a veterinary appointment, and what medications are being purchased for those pets. *See* Statement of Facts § II.B.1-3, *supra*. This is information that is affirmatively entered by users in the Website. *Id*. This information is not anonymized because (i) Meta collects users' email addresses, and (ii) Defendant enables Meta to link users' communications with their Facebook IDs, which reveal their identities. *See* Statement of Facts § II.C, *supra*.

72. Crucially, neither Defendant nor Meta procures prior consent from Californians for Meta to engage in this wiretapping.

73. VCA's Terms of Service informs pet owners that, "[i]f you choose to order pet medications or other prescriptions products via the Sites you are waiving confidentiality of those records, to the extent applicable, with respect of third parties necessary to fill those prescriptions."[52] Meta has no role in filling out prescriptions.

74. Defendant also expressly represents that it will refrain from collecting personally identifiable information. Defendant labels the Meta Tracking Pixel as a "targeting" cookie. Those cookies, Defendant represents, "do not store directly personal information, but are based on uniquely identifying your browser and internet device."

//

//

//

//

//

[52] VCA, VCA Animal Hospitals Terms and Conditions, https://vcahospitals.com/terms-and-conditions.




**Figure 12**

75. As courts across the country have recognized, however, the identifiers that the Meta Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

76. Likewise, Meta never receives consent from Defendant's Website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Meta expressly warrants the opposite.

77. When first signing up for Facebook, a user assents to three agreements: the Meta Terms of Service,[53] Cookies Policy,[54] and Privacy Policy.[55] For California residents, Meta also

[53] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[54] META, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

[55] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy. *See also* https://mbasic.facebook.com/privacy/policy/printable/.

publishes a United States Regional Privacy Notice.[56]

78. Meta's Terms of Service begin by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[57] The Terms of Service then prohibit anyone from using Meta's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent[.]"[58]

79. Meta's Privacy Policy describes how Meta receives information like "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel[,] … [h]ow you use our partners' products and services, online or in person[,] … [and] information like your email address, cookies and advertising device ID[.]"[59] Specifically, Meta acknowledges that "[w]e collect and receive information from partners, … [and] receive this information whether or not you're logged in or have an account on our Products."[60]

80. Meta then offers an express representation: "We require partners to have the right to collect, use and share your information before giving it to us."[61] Meta also acknowledges collecting "information with special protections[,]" meaning information that "could have special protections under the laws of your jurisdiction[,]" but critically, only sensitive information that users "choose to provide."[62]

81. Meta's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[63]

82. For California residents, Meta reiterates that policy: "We require each of these partners to have rights to collect, use, and disclose your information before providing any information

---

[56] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[57] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[58] *Id.*

[59] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy. *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] META, COOKIES POLICY, https://www.facebook.com/policies/cookies/.

to us."[64] The United States Regional Privacy Notice also restricts Meta's ability to collect "sensitive personal information," stating they "will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including the CCPA."[65]

83. Meta's other representations reinforce these warranties. In its Introduction to the Advertising Standards, Meta states "[w]e do not use sensitive personal data for ad targeting."[66] And in a blog post titled "About prohibited information," Meta asserts it has "policies around the kinds of information businesses can share with us."[67] Meta does not want "advertisers to use the Meta Business Tools to share prohibited information about people[.]"[68] Prohibited information includes, among other things, "information defined as sensitive under applicable laws, regulations or industry guidelines[.]"[69]

84. These representations are repeated frequently. Meta created a "Help Center" to better explain its practices to users. In an article titled, "How Meta receives information from other businesses and organizations," Meta reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Meta "believe[s] that a business or organization is potentially violating our terms, we may take action against that business or organization."[70] In another article, titled, "How does Meta work with data providers," Meta repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[71]

85. A reasonable user who reads Meta's terms and representations would understand

---

[64] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[65] *Id.*

[66] META, INTRODUCTION TO THE ADVERTISING STANDARDS, https://www.facebook.com/policies/ads/.

[67] FACEBOOK, ABOUT PROHIBITED INFORMATION, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.

[68] *Id.*

[69] *Id.*

[70] FACEBOOK, HOW META RECEIVES INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[71] HOW DOES META WORK WITH DATA PROVIDERS, https://www.facebook.com/help/494750870625830.

those terms as requiring Meta to enforce an advertiser's compliance with its terms. At a minimum, those terms and representations require Meta to build safeguards for sensitive information. No reasonable user would read those terms and representations as permitting Meta to intentionally intercept electronic communications that it knows the law protects and deems sensitive. And no user, reasonable or not, could read those terms as allowing Meta to aid and abet another party's disclosure of such protected and sensitive information. In short, Meta never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## CLASS ALLEGATIONS

86. Plaintiffs seek certification of the following class: all California residents who have a Facebook account and accessed and navigated the Website while in California (the "Class").

87. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

88. **Numerosity:** The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

89. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

90. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the Plaintiffs, like all other class members, visited the Website and had their confidential electronic communications intercepted and disclosed to Facebook.

91. **Adequacy:** Plaintiffs are adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent

counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

92. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant have acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631

93. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

94. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

95. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

96. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

97. Meta's Business Tools, including but not limited to the Meta Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

98. Meta is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Meta had the capability to use the wiretapped information for its own purposes. Accordingly, Meta was a third party to any communication between Plaintiffs and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

99. At all relevant times, by its Business Tools, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on

the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

100. At all relevant times, Meta used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

101. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Meta to wiretap Plaintiffs and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

102. Defendant knows (and knew when procuring the Meta Tracking Pixel) that Meta is a separate and distinct entity from the VCA Website, the VCA consumers, and the VCA conversations at issue. Defendant knows that Meta uses the Meta Tracking Pixel to eavesdrop upon and record VCA conversations to which Meta is not a party, and that Meta thereby collects the contents of communications between VCA consumers and VCA. Further, the code for the Meta Tracking Pixel did not spontaneously appear on the Website. Instead, Meta's code was purposefully installed by Defendant into the HTML documents and/or other libraries defining the contents of the Website. Meta explains: "to set up a Meta Pixel[,] … set up the [pixel] base code on your website. … [To do so, g]o to Meta Events Manager."[72] Moreover, Defendant knows (and knew when procuring the Meta Tracking Pixel) what, *inter alia*, the "Meta Business Tools Terms" state regarding Meta's use of the contents of the conversations here at issue for Meta's own, unlawful purposes. Specifically, Defendant knows that Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

103. Plaintiffs and Class Members did not provide their prior consent to Meta's intentional

[72] META, HOW TO SET UP AND INSTALL A META PIXEL, https://www.facebook.com/business/help/952192354843755?id=1205376682832142. *See also* META, META PIXEL GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started ("Before you can install the Pixel, you will need your Pixel's base code, which you can find in the Ads Manager > Events Manager.").

access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Meta's conduct.

104. The wiretapping of Plaintiffs and Class Members occurred in California, where Plaintiffs and Class Members accessed the Website and where Meta—as enabled by Defendant—routed Plaintiffs' and Class Members' electronic communications its servers.

105. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

106. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

107. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

108. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

109. Meta's Business Tools, including but not limited to the Meta Pixel, are "electronic amplifying or recording device[s]."

110. Cal. Bus. & Prof. Code § 4857(a) prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal." Accordingly, any communications involving "information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal" qualify as "confidential communications" under California law.

111. The following pieces information provided by Plaintiffs and Class Members to the

Website constitute "confidential communications": (i) pet names; (ii) type of veterinary appointment (*e.g.*, general wellness checkup, emergency); (iii) the time and date of a veterinary appointment; (iv) Plaintiffs' and Class Members' personally identifying information (*e.g.*, full name, email address, phone number); (v) the medications searched for and purchased by Plaintiffs and Class Members); and (vi) pet profile views.

112. At all relevant times, Defendant used Meta's Business Tools to allow Meta to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

113. When communicating with Defendant, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. "Veterinary clients believe the records to be confidential, as their own personal records are kept confidential with their medical doctors," and "the privilege of releasing veterinary information rests with the client." California Bill Analysis, S.B. 490 Sen. (May 11, 1999). Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities like Meta, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

114. Plaintiffs and Class Members did not consent to any of Meta's actions. Nor have Plaintiffs or Class Members consented to Meta's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

115. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Class, naming Plaintiffs as the representatives of the putative Class, and naming

Plaintiffs' attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of any and all issues in this action so triable of right.

Dated: March 14, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Sarah N. Westcot*
Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Attorney for Plaintiffs*